The next case please. Good morning. I don't want to start when you've got your file. If you're ready, I'll start. Good morning. Tell us who you are, who you represent, and about how much time you think you need. Your Honor, my name is Anthony Hill. I represent the defendant appellant Raphael Alvardo. I don't anticipate going particularly long. I usually don't watch, but try to stick to the points. I'm Peter Fisher, an assistant state attorney on behalf of the people. We have read your briefs. We are familiar with the facts of the case. Argue facts as they relate to points of law. Stick to what you consider important points, and we will not hesitate to ask questions about what we consider important. Thanks. Let's proceed. Keep your voices down. I will, Judge, and if for some reason I don't, please let me know. The facts, as you know, Judge, about this case essentially relate to a robbery that took place at a bar. During the course of that robbery, there was an off-duty police officer who was a patron of that bar, and he was shot by one of the robbers. There was some pretrial litigation in the case, but really the major problems from my perspective began during the opening statement. Defendant's lawyer at that point essentially put on the head of a prosecutor several points during his opening statement and gave the jury every reason in this case to convict his client. He pointed out... If you read the paper, you can't miss him nowadays, I guess. And Mr. Adams said, you know, the first thing, almost the first words out of his mouth, this isn't the best client that you could have. He told the jury, I'm not going to dispute the fact that my client's DNA is on a key piece of evidence. Of course, later he did then make some effort to dispute that evidence. He told the jury that his client had been selling drugs since he was 12 years old, which of course would be completely inadmissible in a trial like this. He went into great detail about his client's gang involvement, about the gang culture that his client was raised in, and multiple occasions during his opening statement and then during the testimony, he informed the jury or asked questions or didn't object at various stages to the fact that his client was in fact an ex-con and his client was in prison when he was interviewed by the assistant state's attorney and gave a statement. To compound the problems that Mr. Adams' statement, an opening statement in particular, created in relation to his client and his client's essentially bad character that he presented to the jury, was the fact that at the same time that he was denigrating his client, he was taking one of the state's key witnesses, Officer King, who was the off-duty officer who was shot in the bar, and he was calling him a hero on more than one occasion. So at the same time he was bolstering the state's key witness, he was gutting his client in front of the jury. I think based on that, the prejudice was very severe, and the ineffective assistance that resulted from that opening statement and from his conduct at various points throughout the trial, that in and of itself is enough reason to reverse this verdict. There's no question there's prejudice to your client in some of that. And I've seen a lot of that. But isn't the question under Strickland prejudice to the point where it had an impact on the outcome? And in this case, the defendant did indeed leave. A mask was recovered at the scene with his DNA on it. He was identified by the victim, the off-duty police officer who was shot. He did give a confession to the police and to the state's attorney upon being confronted while in IDOC. What could have occurred that a jury wouldn't convict Mr. Alvarado? What is it that Samantha Junior should have said to get him to walk out of there? I think, first of all, although what you say generally about the other evidence that existed in this case is true, I think that there are serious problems with each of those pieces of evidence, some of which was recognized by the trial court. As far as the statement that was made at the prison, and I think it's very clear, first of all, that the prejudice that goes with the fact that the jury was even led to believe or informed that the statement was taken out of prison was very damaging, and you really can't get past that in my mind. But that statement was not recorded in any way. There was an assistant state's attorney and detectives that went down to see Mr. Alvarado in prison. They made no effort to record the statement, to tape the statement. They made no effort to bring a written Miranda waiver form with them. And they asked his permission to do that. They testified. They asked his permission, and the defendant said, I'm not signing anything. Not so much about the Miranda waiver, but I'm not going to give a written statement. I'm not letting you take a court-reported statement. I'm not giving you a videotaped statement. Not that they have the ability to do that. But, Your Honor, I think there were problems with the statement. I think the same problems existed with the identification, which was made by Officer King at trial, and there were some pretrial motions relating to that identification. But what happened with the identification is that at the time of the crime, Officer King essentially told the investigating police officers that he didn't see who shot him. It wasn't, I saw the person, but I can't identify him. It was, I did not see the person who shot me. Then three, four years later, when the DNA evidence had been processed, they conducted a photo array, and Officer King at that point was somehow miraculously able to make an identification. And I think that, you know, the weight given to that identification is very suspect. Did it also come out when after the crime and he went to the hospital that he was shot and he said that he was in severe pain? So perhaps the officers were questioning him then. The pain may have overruled what the officers were trying to do, and he may not have recalled because of the pain he was in. Well, but I don't think, I suppose anything is possible. But I think that his testimony wasn't that he was in such pain, and he was receiving morphine and other medication and treatment at the hospital, obviously. But I don't think that there was any suggestion that at that time that he felt like he was somehow not able to make an identification. He affirmatively said, I did not see the person. There was no effort at that point, or say 24 hours later, 48 hours later, two weeks later, two months later, there was no effort to go back and get a description of the person who was the shooter. Now, that's particularly troubling in this case because this is a police officer who was shot. This isn't a civilian who maybe, you know, is going to feel like, well, I don't want to bother the police. I don't want to go down and try to connect with them and make an identification or give a description a couple weeks after the fact. This is a victim who himself was a police officer and certainly had the ability and the know-how of going in, making a phone call, talking to the officers who were investigating this case, and providing them with a description. The fact of the matter is that was not done. I think the logical conclusion that should be drawn from that is the fact that he didn't have that information at his disposal. He wasn't able to give a description because what he told the police was actually the absolute truth. He didn't see the person who shot him. But there was plenty of evidence as to the description from the bar owner, the bartender, several customers, correct? There were descriptions. The descriptions that were given I don't think matched the description of Mr. Alvarado that was provided. Nobody identified his photograph. It was like 5'4"-5'8"-Hispanic, 140 pounds. I mean, it fits half the world, but it's accurate in that sense. There's no question that the officer removed the mask and removed the sweatshirt. There is, I would say, some question of that. His testimony on that issue was also different when he was first. When he first spoke to the investigating officers, he did not tell them that he had removed the sweatshirt or the mask. Were they in evidence? Yes, there was evidence recovered. The DNA was sought from someone? There was DNA sought. Particularly at issue in the case was the DNA from the nylon mask. There was DNA on that mask from one sample related to Mr. Alvarado. And I take it then he didn't come back and throw it there. It was taken off of it. Well, there was also DNA from unidentified people, though, which I think muddies the question as to how strong that evidence was and how much it supported the conviction. But there's no question it put the mask in your client's, on his person somewhere with his hand. At some point, and of course that's with DNA. Maybe he was wearing it on his leg. But he definitely had access, your client definitely had access to that mask. And, again, all the witnesses said that's what happened. So when the officer in the hospital is bleeding and is being treated for his gunshot wound, received while lying on the floor, he doesn't remember a lot of things. As you say, he also didn't remember, he remembered a scuffle, but he didn't really remember removing the mask. But the witnesses who were not shot remember him finding the mask, right? But just as the officer was not able to identify the shooter, these witnesses were also not able to identify the shooter, and that includes at the time of trial. Right. There was no one else that testified during the trial that was able to identify Mr. Alvarado as the shooter, except for the officer, the off-duty officer, Officer King, who had previously said, I didn't see the person who shot me. Actually, Mr. Alvarado was around. He could have said I wasn't the shooter. Had he chosen to take the stand and say I wasn't the shooter, he just chose not to, right? Yes, he chose not to take the stand, and that's, you know, there's no dispute about that. He obviously didn't testify. Do you believe that there was any bad faith on the part of the state in reference to the DNA, those two samples? Well, I think that there's a serious problem with the DNA in the case. From what I've been able to discern from the record, and I don't claim to be a DNA expert, from what I've been able to discern, it appears that the DNA sample that's really at issue in the case, the one that had Mr. Alvarado's DNA on it, there's no dispute that it was consumed during testing. Mr. Adam, after the jury was sworn, made an objection to that evidence and said that this was the first that he had heard that it had been consumed. I think the state's response to that, which is that he was informed that it was consumed during the testing and a previous discovery disclosure is, in fact, true. I can't give you any good reason as to why Mr. Adam, when he learned that the material had been consumed or destroyed in the testing, didn't at that time file a pretrial motion. I think it's probably, frankly, just another indication that he wasn't giving the case his full attention. And I think when it comes up during the trial, he actually says that, when he's telling the judge, I just became aware of this. And he also at that point says, if I had become aware of it earlier, if I knew of it earlier, I would have filed pretrial motions on this. I think that goes to the fact that he realized that there was a problem with the DNA. I think the testimony is clear if you sort through it, that the lab that was doing the testing did not receive the required permission from the state police before consuming the evidence. Now, it may have been something that, you know, would have been received if they had asked for it. Certainly, the correct procedure in a case like this where the evidence is going to be consumed is that they get some approval ahead of time. But as far as the due process issues with that evidence, really the key piece of DNA evidence against Mr. Alvarado, the real issue is that he never had a chance to test it. By the time that he was informed of the existence of the evidence, he was basically told it's already been consumed. So even if Mr. Adam had wanted to at that point, he could not have gone out and hired an expert to either observe the testing that was done by the state police if there wasn't enough to do a backup test to confirm the results or to refute the results. He may have been able to make a motion saying the destruction of the evidence prejudiced the defendant, and therefore it should not be allowed into evidence. He made some effort to do that orally once the trial had begun, but there was no pretrial litigation of that because according to Mr. Adam, that didn't come to his attention until after the trial had already commenced and the jury had been sworn. Going back to Mr. Adam's remarks, if he was assuming that his client was going to testify, wouldn't those remarks be justified to some extent? I don't think at all, frankly. First of all, there's no indication that his client was going to testify. He didn't promise that his client was going to testify, and Mr. Adam certainly doesn't have an issue with promising that his client is going to testify. But the real issue with what he says in his opening statement is that even if his client had testified, none of that or at least much of that evidence would not have been admissible. There was no effort made to introduce it through cross-examination or some other witness. But even if Mr. Albardo had testified, I don't see how it would have been admissible that he's been selling drugs since he was 12 years old or that he's been gang involved for a long period of time. In fact, as far as the gang involvement goes, I think it's, I was somewhat surprised. I don't know that I've ever seen it before, but at one point during the opening statement when Mr. Adam was talking about his client's gang involvement over and over and over, the state's attorney actually objected to it. Now, I've never known a state's attorney to object to evidence that a defendant on trial is gang involved. I can't tell you why that objection was made and it was overruled, but I think that that indicates that even the state's attorney was worried about the road that he was going down because the evidence was clearly prejudicial, clearly inadmissible, and Mr. Adams was doing everything that he could to, you know, slander his client in front of the jury. Well, yeah, and that's how it works up here in the appellate lawyer's office. They have to, right? That's the nature of the system. I've never heard an appellate lawyer come up and praise a trial lawyer of their client because that's why they're here on appeal, if they're the appellant, that is. And so in this case, it is prejudicial to say you're in a gang. At the same time, the state posits the theory that Mr. Adam was saying that because the deal about being a gangbanger is you keep your mouth shut, and it makes it highly unlikely that in an effort to attack this unwritten oral statement, the oral statement was that he wouldn't have talked because he's a gangbanger. Gangbangers don't talk. Rule number one of the gang is don't talk. And the reason that he would say that he's a dope dealer forever is that he's a dope dealer. He's in prison on a dope deal because he's not an armed robber. He makes money selling dope. He's not an armed robber. Why would he do that? He's a dope dealer. That's not much, and don't get me wrong, it's hurting, but when you've got DNA, a confession, and an eyewitness is a copper who got shot, it's something. You've got to say something, right? You're standing in front of a court, 12 people are looking at you. You've got to say something. You do, but I think the absolute wrong thing to say, and I don't think that there's any excuse to say my client is a terrible guy and let me tell you why and start your case with that. I think the only thing that a jury will do under those circumstances is agree with the lawyer. Look, this guy's lawyer doesn't like him. This guy's lawyer thinks he's a bad guy. So, of course, I'm, as a juror, going to think the same exact thing. Well, if we agree with you and the way this case is going, you know, Mr. Hill, is that then we're allowing you to get a retrial card. Every time that this court would say, I would never make that argument, I agree with you, Mr. Hill, it's a terrible argument. Let's reverse it and get some different private guys. Poor mother is paying for all these lawyers with this guy with a DNA and a confession. My heart really goes out to her. They'll get a jail-free card, but a new trial card, by saying something that this court would disagree with. Well, and I understand that the state made that argument, but I think that's pretty disingenuous to suggest that a defense lawyer would somehow make an improper argument in order to give his client a get-out-of-jail-free card. I've seen it done scores of times. Well, I don't think there's any indication that that's what was happening in this case. I think that, you know, in some of the cases that the state relies on, you know, there was some indication that the defendant was flip-flopping on his decision on whether to testify or not to testify. In this case, there's nothing in the record that indicates that Mr. Alvarado was ever intending to testify. I mean, there's, I suppose, some implication from the opening statement that maybe there's no other way for that evidence to come in, but I think that this case could certainly have been tried, given the weaknesses that I've discussed, through cross-examining the witnesses, pointing out the weaknesses of the confession of the DNA of the other evidence, and that. . . Well, going back to the DNA, you'd have to prove bad faith, wouldn't you, under Illinois v. Fisher? And I think that there is an indication that there's bad faith, because there was no permission obtained from the state police for the contracting agency to destroy the DNA sample when they did the test. Well, they had permission to destroy a sample, right? The question was which sample, right? It was testified about, because they hadn't asked about it. They destroyed the sample that had the defendant's DNA on it. But does that make it bad faith? Do you think the person in cell mark thought, hey, Alvarado, if they don't have the DNA, I don't like this guy, this particular ten-digit number. They don't like him at all. I'm going to say it's him, and I'm going to burn the evidence that he's done. I don't know that there's any other explanation for why it would be destroyed. I mean, maybe it was. . . When the test results are there, then would it go to the credibility of the tester? Well, frankly, there was some attempt to go into the credibility of cell mark and this technician, Patricia Fish, who's been the subject of a lot of litigation. Who was brought up in trial court? Mr. Adams attempted to, but several objections were sustained, and he was kind of shut down on that line of questioning. But the key, I think, is that the evidence that existed was, given the fact that there was a confession and given the fact that there was DNA in the case, it's actually a very weak case. And when it's a weak case, given the circumstances of that evidence and the problems with that evidence, when you make a statement like Mr. Adams did that polluted the jury from the get-go against his client, the case has to be reversed. What was your statement that you made a few minutes ago in reference to the defendant flipping as to whether he would testify? What did you say? Judge, there was a federal case, United States v. Taylor, that the state cited in their brief. It's at 128 F. 3rd, 1105. And in that case, the conviction was affirmed, and there was testimony that the defendant had initially decided not to testify, and then they took a break, and he decided that he did want to testify. Then ultimately, he went back and decided that he did not want to testify. So the result was the same, but that was an issue that was raised in the case. That was something that the state cited as a reason, I guess, to consider whether it's the defendant who's creating the problem here. Do you have any knowledge as to whether the defendant in this case had planned to testify at some point? There's nothing in the record that suggests that he planned to testify. And, you know, I think that it's a very difficult position to put a defendant in and really to put anyone in. But what the state is saying is, you know, if your lawyer makes a statement and you have an effective lawyer and your Sixth Amendment rights are upheld, then to some extent maybe you're giving up your Fifth Amendment right. And, you know, I just think that there's a real problem with trying to go down that road and saying you've got to choose somehow between a Fifth Amendment right and a Sixth Amendment right. And that, you know, the specter of some possible misconduct by some lawyer or some defendant is a reason for this court to affirm that behavior, and I just don't think that that's a good road for this court to go down.  Then would you think that his attorney saying that he was a low-level dope dealer or seller, that he may have been saying that to say he commits these type of crimes, low-level crimes, but he's not going to elevate to armed robbery? Well, there are things that he could have said if he was expecting his client to testify. I mean, if he had just said, my client's been convicted before, and you're going to hear from my client and you're going to hear that he's a convicted felon, then that's not an issue, but he goes well beyond that, and he goes into things like he's been selling drugs since he was 12 years old, and let me tell you all about his gang involvement, and let me discuss things that, frankly, are just not admissible. That's the problem in the case. If it was just a question of my client is going to testify, this is what he's going to tell you, and here's the relevant admissible grounds that he's going to be impeached on that I'm going to front for you in my opening statement. There's no issue. I want you to feel sorry for him because he really, at 12 years old, was out on the street selling drugs and supporting his battle. I hear what you're saying, but I just don't think that that's what happened here. I mean, when I read this record, the only thing that it appears to me is that the defense lawyer, frankly, just didn't give much thought in the theory that he was going to present. Perhaps the key thing that supports that conclusion or the reason why that's sticking in my head is this DNA evidence because in his opening statement he says, I'm not going to contest that the DNA is on there. He then spends. And King is a hero. And King is a hero. But he's not a hero. He's a hero for my guy. He's a hero. We admit that. But not this guy. He didn't do it. That's common, isn't it? I don't know how common it is in a case like this. Maybe they watch too much television. I mean, just going back to the DNA. The DNA, he says he's not going to contest it. Then he contests it. And then almost half of his closing argument is about the problems with the DNA. Now, if he had given thought to the case and decided, fine, let the DNA come in because there's other DNA on there, because there's this Caucasian hair that's recovered, which clearly doesn't come from my. They're Caucasian. This guy is Caucasian. Well, there's also. Even the census says that. Yeah. I mean, I don't know the. They're from Spain. I suppose that's true. I don't know how the hair factors into that. I know there was testimony. I'm sorry. There was testimony that there was a, that the complexion was different between Mr. Alvarado and the person that was described. I don't know how the hair factors in. I'm saying the hair. It was a testified hair. It's got the other briefs. Hispanic hair is described as Caucasian hair. Right. But it wasn't matched to Mr. Alvarado. So there's, you know, there's other. There's some evidence that someone else may have been in contact with. Pamela Fitch testified to that hair. Mr. Alvarado. I think if you hear the difference of kind of appeal, people shouldn't be testifying about here. I won't comment on that unless you're looking for one. I think that was pretty rhetorical. Unless your honors have other questions, I'll just reserve my time. Thank you. Thank you. Counsel. Good morning and may it please the court. I'm going to start in a little bit different order than counsel. I'll start with the DNA evidence that Justice Steele asked about. And I'm sure counsel inadvertently misspoke,  Both stains have the defendant's DNA. There was a stain that was designated cell mark 01. That's the larger stain of the two. That particular stain, the defendant's DNA is the major contributor. It's a mixed. Which you're talking about, number one or number two? Cell mark 01, number one. The first, the larger stain, the stain that was not consumed. That stain, there's a minor contributor and a major contributor. And they do that by the amount of DNA that's available for testing in that case. And the major contributor came back to be defendant's. The minor contributor came back to be unknown. The second stain, the smaller stain, cell mark 02, came back completely to the defendant. But let's remember the timing in this case. The crime was committed in 2001. Cell mark gets the DNA, the samples, the cuttings of the nylon in 2004 and does their testing. At the time they do their testing, no one is in custody. There are no suspects in this case. Alvarado is not a suspect. And basically it's a whodunit. The testing is done and cell mark asks for permission. And there is a dispute as to whether they got permission from the state police. But, again, that's a procedural problem. It's not a legal problem. In any event, they say we need to consume this because we don't know how much there is on this. And we're going to consume it. So they consume the whole thing. They don't destroy the evidence. The evidence was used in testing. And that nylon and that cutting and the chemicals and everything else are put in a little test tube and mailed back to the Illinois State Police. So this is not destroyed. There's not some bad faith. This is common practice on small samples on stains on fiber objects when you can't tell. It's not like a little swab where you know how much you've got. You don't know how much you have on these stains. And if it's a small stain, they've got to consume the whole thing. The point is the defendant is on both stains. The only stain that counsel started to complain about in 2007 was stain number two, the consumed stain. Let's say he's successful in getting that thrown out. Number one is still there. The defendant's saliva is still on that mask. And that mask is found on the floor of that bar. So that's strong circumstantial evidence that this defendant was involved in the case. No matter what you do with stain number two, there is a line of cases that talks about evidence that's destroyed. And that can only be held against the state in certain circumstances. Basically, now, I would argue that it has to be bad faith by the state. There's clearly no evidence of bad faith in this case. There would also have to be a request by the defense to say this. Well, there was no defense in this case yet because it was 2004. The defendant wasn't arrested until later that year after the evidence is sent back to the Illinois State Police. It's run in the CODIS program, which is that master program that's got, it's a DNA database. Defendant's name is spat out. The police get his name. They put together a photo array. They show it to Officer King. Officer King says that's the guy the defendant is then spoken to at the prison, makes a confession, and the defendant is charged with this aggravated battery of the firearm and armed robbery. So at the time that the consumption, not destruction, of evidence takes place, there clearly could have been no request by defense counsel to save this evidence because there was no defense counsel yet. Nobody knew who, and Justice Stevens in one of the cases that I point out said that everybody had a reason to look at this evidence and to save this evidence at the time because nobody knew who did this case. So it wouldn't have done the prosecution any good to destroy this evidence because they didn't even know who they were dealing with at the time. So there's clearly no bad faith. The other thing to remember is that this was a rather disingenuous motion by defense counsel to bring this up at the time he did. It's after the jury's been selected. It's a year after he's already signed a discovery receipt, and that discovery that he received had the evidence from Selmark and said this particular item was destroyed. During the course of time, he never made a motion to have his experts look at Selmark No. 1, which to this day is still available for anybody to test and was available at the time of trial in 2007. He never made that motion. He didn't really want this stuff tested. He wanted to make a motion to try and throw a monger wrench into the trial. It was a nice try. It had no basis, and it was properly denied. Turning to the ineffective assistance of counsel claim, under Strickland, we have to presume competence. We don't presume incompetence. And if there's any set of facts that you can look at this record and say, there's a trial strategy there. We may not agree with the trial strategy, but there was a strategy there. Then you have to affirm. This is direct appeal. We can't decide whether the defendant, you know, what was going on with the defendant and his lawyer, other than to say that we have to presume effective assistance of counsel. And when you look at what Sam Adam, Jr. said to that jury, it's very clear that he expected his client to testify. It's also very clear that he lost the motion, the Montgomery motion, before trial. It's clear that he filed a motion. Now, appellant hasn't provided us with a transcript, so it must be held against him, and it must be presumed that he lost that motion and, therefore, the defendant's four approvables were going to come in against him when he testified. If you look at the kinds of things defense counsel was saying in opening statement, it was basically, as your Honor has pointed out, look, my guy's a bad guy, but he's going to fess up. He's going to be man enough. He's going to own up to those bad things that he's done. And that will make more believable when he comes on the stand and denies doing this shooting of this police officer in the bar, in this robbery. He had nothing to do with it. That's a legitimate strategy. That's a reasonable strategy. But there's no evidence in this record that that was a strategy, isn't that right? Counsel's not incorrect when he says there's no evidence in this record that the defendant even considered testifying. Which, given Strickland, I think you then have to presume that you're right. You know, if he wants to bring it up in a PC, fine, bring it up in a PC. But this record doesn't have any evidence. So we have, given the presumption under Strickland that we have to presume competence, I think you have to presume that he and his client talked about it. And then you look at his client's. It is. Well, it couldn't have gone even if he didn't testify, as it did here, as it may in Blagojevich. Again, you have to say something. You can't remain mute because that would be ineffective. And nobody would pay you any more money. So you have to say something. And as Justice Steele was pointing out, and Justice Murphy was pointing out, part of it's a sad story, a sad story. Part of it is, hey, I know, finally, I've liked this law, not that law. Well, and I agree with that. And as we point out in the brief, there's a dangerous line that we're treading here. In many of these cases where defense counsel says something that he can't back up in opening statement, it's actually the state that's hurt. And in this case, he actually said, my client didn't do it, and he named somebody else who did do it. And he also, he says that my client didn't voluntarily give the statement. And there's all these defenses that he throws in there that we can't contest. I mean, if his client takes the stand, he's got to deal with his provables, and he has to deal with cross-examination. But if he doesn't take the stand, he doesn't have to deal with either of those. Now, granted, here he funded the provables. But he did get his defense out, and we could do nothing about it. And in fact, after the defense rested, or before the defense rested, the judge asked the defendant, do you want to testify? And Sam Adams says, you know, I've visited him numerous times, at least 10 times in this case. We visited in private today. So clearly they were discussing at length, I think we can presume, the fact that the defendant was going to testify. Now, he decided not to. And that's his choice, and his choice alone. A lawyer cannot make his client testify. A defendant has a constitutional right to decide it one way or the other. And the defendant chose not to testify. At which point, the state asked for a sidebar, saying, judge, you know, we're kind of caught between a rock and a hard place here, because in opening statement, counsel said all these things, and none of them have come forward. And we're kind of at a disadvantage as to some things. Now, obviously some things hurt the defendant. We recognize that. But other things hurt the state. And the judge says, well, you know, you can comment on it. Be careful, because you can't, you know, trample on his right to remain silent. And then Sam Adams got up and basically said, you know, I know you're looking over here and saying, Sam, we probably thought Raphael was going to testify. I know that. I know in this case. But I know what I'm doing. So he danced around the issue. He tried to, you know, diffuse what was coming when the state said, remember that opening statement? Well, you didn't hear any of that stuff, which was a proper statement. And, you know, the defense has conceded that we can properly comment like that when an opening statement is made like that. So if you allow defense counsel to, as Justice Quinn pointed out, the get-out-of-jail-freak card, you're allowing them to make any statement they want an opening statement. And if they want to throw a defense in there, fine.  And then you get your guy off and you don't have an appeal. If it doesn't work, you have an appeal and you win on appeal. So you win either way. So it's actually encouraging this type of conduct. Now, I think defense counsel should be entitled to rely on their assessment of whether or not they think their client is going to testify. Given this case, you have to look at it prospectively whenever you're looking at Strickland. And prospectively, he knew that there was a confession he had to deal with. There's DNA he had to deal with. There's going to be an eyewitness identification he had to deal with. And he has to do something to get rid of all those factors. And he has a strategy here. You know, the confession was coerced. The identification didn't match because the officer originally didn't say that he identified anybody. And the DNA testing, you know, had problems. And so looking at it prospectively, there's no way he could have dealt with those issues without his client taking the stand. Doesn't it seem a little unusual, though, that the officer, the trained officer, did not give a better identification after the incident of this guy, other than say his height and weight? Well, again. And then two years later, he looks at a photo and says, yeah, that's the guy. Well, you know, that is a jury issue. The other thing that I will remark has already been stated. You have to remember, this officer is shot in the stomach. He is on morphine or other painkillers at the hospital. He also has been hit very hard in the head with the butt of the gun. Remember, he has 12 stitches in the side of his head and a big knot there. So, I mean, this man has suffered severe trauma over the course of that evening. And, in fact, he doesn't even remember speaking to the detectives at the ER. He doesn't remember speaking to anybody at the ER. Now, we stipulated that he did because we have a detective saying he did. We're on board there. Now, with all that you said just then, so then he didn't tell the, he couldn't give a description then. At the time, no. And he couldn't give it two months later. But then a year later or two years later, he says, that's the guy. Well, he didn't give a description two months later. I don't think there's any evidence about whether they talked to him again two months later. But the evidence in the trial is that they talked to him that night and he couldn't give a description. But. Let me flip it then. After the incident. Yes. And he didn't give it that evening. And we understand he was in severe pain and what have you. Before he looked at that photo array, did he give him a description? I'm sure the detectives must have went back to him and said, hey, you know, you're an officer. Can't you describe this guy? Did they ever do that? Well, there's no evidence in the record that they did. So, I mean, we can only deal. He didn't make a description after he was shot and everything. He didn't make a description until two years later when they showed a photo array. Then he picked the guy. He did. He picked the guy out. But there is no question that he had an opportunity to observe the defendant in the bar. There's no question that the defendant or the offender was wearing a stocking mask, nylon stocking mask and a sweatshirt. And that there's a tussle. And that during that wrestling on the floor, that that mask and that sweatshirt come off. And the reason we know that is not just because Officer King says that. And also that Mr. Tuntas, the bar owner, said, I saw this. Now, he can't identify the defendant. But he says, yes, the person that shot King was wrestling with King on the floor. King got his mask off and his sweatshirt off. And we also know that the mask and sweatshirt are left on the floor of the bar with the defendant's saliva on the mask. We also know the defendant himself confessed to this crime. Now, did he give a complete confession to everything that he did? No. He admitted being in the bar. He admitted holding the gun. He admitted doing the robbery. But he wasn't going to admit shooting anybody. When you take all that evidence together, the evidence is very overwhelming. And that's what defense counsel knew ahead of time. And knowing that ahead of time, he had to come up with a defense. And that defense, and you look at the things that he said in opening statement, the things that he said could only have come from the defendant himself. As I point out in the brief, the answer to discovery listed no other witnesses other than the people's witnesses. So where else is he going to get this stuff about selling drugs as a 12-year-old or the hierarchy of the gang or who this other person is? I can't even remember his name, but the person that Sam Adams said in his last remarks in the opening statement. And you'll find out that the real shooter is Mr. X. Timmy Pinowski. Yeah. I mean, where did that come, other than the defendant himself was going to say it? No. It couldn't have come from anyone. That doesn't lead to that. It means the defense counsel is testifying up there. It helps the jury find him. He has no intention of calling this a crime. But may not. He may. But what terms would make it? As you say. Which is even more the reason. That's how it works. He's going to hurt the state anyhow, make up a defense, put it in front of there, and then walk away. In light of what we argued in the briefing here today, we'd ask that Your Honors affirm the defendant's conviction. Thank you, counsel. Thank you. Justice Quinn, you make me think that you're a little bit cynical about this. I'm sorry? Cynical? You're making me think you're a little bit cynical about this. I'm an old guy. I know I don't look it, but I'm an old guy. I would just like to make one point. I'm not as old as Murphy. I'm not going to go down that road because I'm the youngest of the bunch. I want to quote some language from People v. Morris, which is a 2004 Supreme Court of Illinois decision. Once defense counsel introduced the extensive and inflammatory evidence regarding the Jones murder, the minimal but constitutionally acceptable strategy of appealing to the jury's sympathy regarding the murder of Irvin Shorter was utterly negated. The reason why I think that obviously that has some applicability here is that, just like the evidence that the Supreme Court is talking about in Morris, which was evidence of another crime, there was a pretrial motion in that case that went in the defendant's favor and that the evidence was determined not to be admissible. But despite that ruling and going into that ruling before the trial started, the defense lawyer got up and talked about it in depth in opening statement. And the Supreme Court found that in that case, the prejudice created by going into that inadmissible, prejudicial, highly inflammatory evidence was enough both to support a finding of ineffective assistance of counsel and to reverse a murder conviction. I think that the exact same situation essentially is what we have here. Setting aside the possibility that there's some sleazy lawyer out there who's going to game the system, I think what we have here is a problem that results not in fronting what otherwise would be admissible impeachment, telling the jury that your client's going to testify, this is what your client's story is going to be, and then the client not, in fact, testifying. What we have here is the introduction by defense counsel of inadmissible, inflammatory, prejudicial evidence. I just don't think that you can get past the fact that that prejudiced the jury against Mr. Alvarado and that because of that, the case should be reversed. So as I understand it, Morris, the judge ruled that you can't mention Fred Jones, the murder of Fred Jones, and the Morris attorney actually did mention Fred Jones. That's correct. And went into it in the opening statement. But also said, and he also committed this crime as well, and that's why the Supreme Court said what you just read, is that she's throwing her client on the mercy of the jury. So you're going to find him guilty. She said, tear up the not guilty verdicts. He absolutely did all this. And then put them to front the second murder. That takes away the idea of a jury nullification. He's not deserving of any breaks. Well, I think there was some suggestion by the panel that the fact that Mr. Alvarado had been selling drugs when he was 12 years old kind of falls in that same vein. The fact that he's telling the jury that he has been selling drugs since he's 12 years old is going to garner some sympathy with the jury, and that may be why it was said. But the reality is that I think the same analysis applies, that it's inadmissible evidence, it's prejudicial, and there's absolutely no reason for defense counsel to put that in front of the jury. The attorney also did not argue for his client at all, and that was a big issue. That was. And in this case it's different. The attorney did argue for his client on every point. And that is true. There certainly was a more concentrated effort here to contest the other evidence that was available in this case, and I'm not saying otherwise. But I think that the root of the Supreme Court's decision in Morris is that it was prejudicial. It never should have been said. And once you've put that prejudice, once the bell has been rung, as we all say all the time, once the bell has been rung, you can't unring it. And that's what happened in Morris. I think that's exactly what happened here. Are there any other questions? Thank you for your time. Thank you very much. We'll take the case under advisement.